**IN THE UNITED STATES DISTRICT COURT**
**FOR DISTRICT OF KANSAS**

| | |
|---|---|
| Justin Spiehs<br><br>               PLAINTIFF<br><br>     v.<br><br>Luther Ganieany, *in his individual capacity* as general counsel for the Kansas Highway Patrol<br>\*<br>Rod Strole, *in his individual capacity* as records supervisor for Kansas Highway Patrol<br>\*<br>Florencio Chavez, *in his individual capacity* as Officer for Kansas Highway Patrol<br>\*<br> Sebastian Baeza, *in his individual capacity* as Officer for Kansas Highway Patrol<br>\*<br> Tyler Hummel, *in his individual capacity* as Officer for Kansas Highway Patrol<br>\*<br>Erik Smith, *in his official capacity* as Superintendent of the Kansas Highway Patrol<br><br>        DEFENDANTS | Case No. 5:26-cv-4043<br>Jury Trial Requested<br><br>*Complaint* |

Plaintiff Dr. Justin Spiehs alleges as follows:

## Overview

1. This case began not with a disturbance, a threat, or an obstruction, but with a scheduled public-records appointment. Dr. Justin Spiehs went to the Kansas Highway Patrol records office at a scheduled time for a lawful purpose: to inspect video records KHP had agreed to make available. He waited quietly in the public lobby. No alarm was warranted. No emergency existed. Defendant custodian Strole nevertheless pressed what appeared to be a panic button, and within moments armed

1

KHP troopers arrived in a public lobby where the two citizen journalists Michael Eravi and Dr. Justin Spiehs had been standing silently.

2. What followed was not a neutral exercise of records-office administration. It was a sequence of escalations driven not by anything Plaintiff did physically, but by what Plaintiff said, how he said it, and his refusal to stop saying it when government officials told him to be quiet.

3. The legal dispute at the center of this case is straightforward. A KHP trooper announced his own condition on the records inspection: Plaintiff could view the body-camera footage, but could not record what KHP was permitting him to view. Plaintiff disagreed and questioned the legal basis for that condition. That disagreement was entirely verbal, entirely lawful, and entirely protected. Even accepting KHP's position for the sake of argument, the appropriate response to a visitor who disputes the terms of a records inspection is to decline to proceed and return behind the office door. It is not to summon lawyers, manufacture a disruption, and make an arrest.

4. Instead, KHP summoned its General Counsel, Defendant Ganieany, an in-house attorney outside KHP's ordinary field command structure. Ganieany did not neutrally resolve a records question. During the statute-reading exchange Ganieany attempted to take Mr. Eravi's phone he was reading the statute from, pointed his finger in Eravi's face, and repeatedly demanded silence from both Eravi and Spiehs. Plaintiff continued to speak and to respectfully disagree with KHP's asserted position. Only later, after Plaintiff used the word "asshole" (that no law prohibits in a public space) did Ganieany then point at Plaintiff, direct the troopers to remove

2

him, announce "interference" before any trooper had made an independent assessment of probable cause, and then signal from behind the lobby glass as the arrest sequence was carried out.

5. The arrest justifications collapsed in real time. The stated basis was trespassing during transport to jail. It then became "interference" by the time of booking. It then morphed to "interference with a workspace" and eventually landed at "interference with a law-enforcement officer."  One of the officers involved later admitted that he wrote what he was told and that he had not been present for much of what occurred. No defendant has identified a single physical act by Plaintiff that constituted a crime. The only conduct they have ever pointed to is speech: criticism of KHP officers, a legal argument about records access, a profane word, and a refusal to stop talking when ordered to do so.

6. Plaintiff did not have to leave because he was harming anything in the lobby. The lobby was public. His purpose was lawful. His appointment was scheduled. KHP could have stopped the inspection, closed the window, and returned to its office. It chose instead to treat disagreement as disruption, criticism as interference, and persistence as a crime. Every justification shifted the moment it was examined, because none of them was real.

7. This action seeks redress for that unconstitutional escalation: the arrest of a citizen journalist who did nothing more than ask for records and then refused to be silenced by the government officials.

**JURISDICTION AND VENUE**

8. This action arises under 42 U.S.C. § 1983 and the First and Fourth Amendments to the United States Constitution.  This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

9. Venue is proper in this District under 28 U.S.C. § 1391(b).

**PARTIES**

10. Plaintiff Dr. Justin Spiehs is a Kansas resident who is a citizen journalist and regularly engages in peaceful political expression and civic advocacy in public forums. He is well known in the police community including the Kansas Highway Patrol community who he has previously sued for Constitutional violations in *Spiehs v. Smith* . 25-cv-04067 JWB/BGS.

11. Some of the YouTube recordings of the events described in this Complaint are located at https://youtu.be/vftERUrCVYM https://youtu.be/V-q89t5uS0Q https://youtu.be/N2Fc-Oi4Iqg https://www.youtube.com/watch?v=1-a5Tb7KHvw https://www.youtube.com/watch?v=1-a5Tb7KHvw https://www.youtube.com/watch?v=PvzVKmdZlkE

12. Defendant Erik Smith is a natural person and Superintendent of KHP. Erik Smith is sued in his official capacity

4

13. Defendant Luther Ganieany was at all times relevant hereto an employee of the Kansas Highway Patrol and acting under color of state law as employee of the State of Kansas. Defendant Ganieany is sued in his individual capacity.

14. Florencio Chavez is an officer employed by KHP. Defendant Chavez acted under color of state law and is sued in his individual capacity.

15. Rod Strole is an employee employed by KHP. Defendant Strole acted under color of state law and is sued in his individual capacity.

16. Sebastian Baeza is an officer employed by KHP. Defendant Baeza acted under color of state law and is sued in his individual capacity.

17. Tyler Hummel is an officer employed by KHP. Defendant Hummel acted under color of state law and is sued in his individual capacity.

**Facts**

18. This is a civil-rights action under 42 U.S.C. § 1983 arising from Plaintiff Dr. Justin Spieh's arrest at the Kansas Highway Patrol ("KHP") records office in Topeka, Kansas, on March 13, 2026.

19. Dr. Spiehs had a scheduled appointment to inspect public records at the KHP records office. He went there for a lawful purpose: to inspect and copy records that KHP had agreed to make available for viewing.

20. Instead of permitting Plaintiff to complete that public-records inspection without unconstitutional interference, The defendant KHP officials and troopers escalated a verbal disagreement about access rules into an expulsion order and arrest.

21. Dr. Spiehs was threatened with crimes, ordered out of a public government lobby, and arrested because he criticized KHP personnel, displayed a message critical of a trooper, argued about the law, and refused to stop speaking when KHP's lawyer demanded silence.

22. The asserted justifications shifted from alleged office disruption, to trespass, to interference with law enforcement. But Plaintiff did not threaten anyone, physically obstruct anyone, damage property, or interfere with any legitimate law-enforcement duty.

23. Before March 13, 2026, Plaintiff requested records from KHP under the Kansas Open Records Act. A dispute had already arisen between Plaintiff and KHP over whether KHP could forbid Plaintiff from recording body-camera footage that KHP allowed him to inspect and view. KHP claimed KORA prohibited recording of documents or videos that KORA allowed inspection of. Dr. Spiehs disagreed asserting no such restriction existed in the KORA statutes.

24. Dr. Spiehs arranged an appointment with KHP employee Megan May for March 13, 2026, at 10:30 a.m. at the KHP records office located at 708 S.W. Jackson, Topeka, Kansas, to inspect and copy records.

**25.** On March 13, 2026, he arrived at the appointed time with Michael Eravi. Both are citizen journalists and were recording KHP conduct. Dr. Spiehs also carried a written message critical of certain KHP troopers, although he did not display that message until after one of the troopers referred to his message.

**26.** When Spiehs and Eravi arrived, defendant Strole told them that Megan May was absent and that staff would need time to set up the video for viewing. Both Eravi and Spiehs waited quietly in the public lobby, disturbing no one, at times speaking softly to one another or remaining silent altogether.

**27.** While both quietly waited in the public lobby, Dr. Spiehs observed defendant Strole press a button on the wall, Plaintiff observed this and believed it to be an emergency alert or panic button of the type used to summon law enforcement. No emergency existed at that time. Neither Spiehs nor Eravi had raised their voices, touched anyone, blocked any entrance or exit, or done anything physically disruptive.

**28.** Defendants Chavez and Baeza arrived in the public lobby in direct response to Strole pressing that button, before any arguable disruption had occurred and before Plaintiff had displayed any written message. Chavez had previously been involved with Dr. Spiehs in other interactions and was a defendant in *Spiehs v. Smith.*

**29.** Chavez told Spiehs and Eravi what Chavez described as KHP's "rules;" that viewing and inspecting of the body-camera footage was permitted but no one could record what was being viewed and inspected.

30. At that point Dr. Spiehs displayed a written message with words saying "KHP Officer Chavez is a dumb hoe." Defendant Chavez acknowledged that he saw the message and indicated he was already aware of it. After in discussing the law for twenty minutes with the KHP attorney becoming angrier by the minute, Eravi then quietly displayed a written message stating "KHP Officer Manker is a dumb fuck."

31. Dr. Spiehs then spoke words civilly disagreeing with defendant's Chavez's legal opinion and asked what would happen if he recorded while viewing the video produced for his viewing and inspection. Chavez responded that KHP would tell Dr. Spiehs to quit while at the same time stopping the playback of the video. Chavez said KHP would then tell Dr. Spiehs to leave, and that then "the same thing that always happens" would occur which Dr. Spiehs understood from past interactions with Chavez to mean arrest and use of force upon Dr. Spiehs.

32. Defendants Chavez and Baeza also told Spiehs and Eravi that they would remain in the viewing room while Dr. Spiehs inspected and viewed the video. Dr. Spiehs asked them whether this conduct was an intimidation tactic which they denied and claimed staff had requested their presence in the viewing room.

33. Because of Chavez's conditions imposed on inspecting and viewing the recording, Dr. Spiehs had a legal question about open-records access that Chavez was unable to answer. Spiehs requested a staff member. A staff member named Stacy came into the lobby, briefly spoke with Spiehs and Eravi, and told both she would get Luther Ganieany. Upon information and belief, defendant Ganieany is an in-house attorney

for KHP.  It was not normal and highly unusual for Ganieany to be present at a KHP open records inspection.

34.  Attorney Ganieany entered the KHP public lobby from the KHP office area and identified himself as Luther Ganieany. Spiehs asked why he was there, and defendant Ganieany said he had come to speak with Dr. Spiehs.

35. Eravi and Spiehs respectfully dialogued with Ganieany about the governing statute. They disagreed with Chavez's conditions and pulled the relevant statute on Eravi's phone and read it verbatim to Ganieany.

36. Ganieany reached for Eravi's phone and attempted to take it.  Eravi told Ganieany that Ganieany was not taking his phone and that Ganieany could obtain the statute language on Ganieany's own phone. Ganieany took his own phone, pointed his finger in Eravi's face, and repeatedly told Eravi "then stop talking then" while Dr. Spiehs continued to calmly tell Ganieany regarding why the KHP interpretation of the statute was incorrect. Ganieany repeatedly told both to stop talking to him.

37.  As Dr. Spiehs continued his explanation as to the correct interpretation of the statute, he said to defendant Chavez that he knew the law better than the "assholes" in the room. Upon hearing that statement to Chavez, defendant Ganieany immediately stopped reading, put away his phone, pointed to the exit, and told Dr. Spiehs to leave because, according to  Ganieany, he was not going to stand there and be called an "asshole."

**38.** In responding to Ganieany's command to leave, Dr. Spiehs told Ganieany that he could not lawfully require Spiehs to leave a public lobby for saying the word "asshole" and of which Spiehs repeated the word several times.

**39.** Ganieany then claimed that Dr. Spiehs was "disturbing this office" but only referred to Dr. Spiehs civil and legal statements constituting Dr. Spiehs words which were his protected speech.

**40.** Both Eravi and Spiehs continued to civilly dialogue with Ganieany explaining that they were at a public records office for a lawful purpose, that they were not required to leave merely because Ganieany disliked Dr. Spiehs opinions about the statute or words Dr. Spiehs used, and that they could remain in the public lobby causing no disruption.

**41.** Ganieany became visibly flustered, paced back and forth, sighed deeply, and announced that if Dr. Spiehs would not agree to the conditions he had to leave. Ganieany escalated the situation further by turning to Trooper Chavez, pointing at Dr. Spiehs, and said: "He needs to leave. He's got two choices he won't agree to view the video under those conditions and he can't stay here arguing with us because this office is open for customers. So he needs to leave and stop disrupting. Ok?"

**42.** Ganieany then told Eravi and Spiehs "They're going to talk to you now," repeated that they were required to leave, and told the defendant officers, "Would you mind ordering them to leave?"

**43.** When Dr. Spiehs asked Ganieany what would happen if they did not leave, Ganieany stated that they would be arrested for "interference." Spiehs asked "interference with what" to which Ganieany first answered, while pointing at the troopers, "with their job duties," then said, "You're interfering with this office," and further claimed that Chavez had already given Dr. Spiehs and an order to leave which was false.

**44.** After that exchange and before the arrest, Defendant Chavez exited the public lobby through the locked door into the restricted office area. While in the restricted area, Chavez spoke by phone with Ganieany. Chavez later admitted to Eravi that his body camera was muted during that phone call and while he was speaking with office staff in the restricted area, meaning no recording exists of the coordination between Chavez and Ganieany immediately preceding the arrest.

**45.** Ganieany then turned to Strole through the glass. When Ganieany asked Defendant Strole through the glass reception window whether Strole had any issue with Spiehs and Eravi being in the lobby, Strole shook his head no. Ganieany then motioned for entry into the restricted area. Moments later, at Ganieany's direction, Strole came to the door and claimed for the first time that Spiehs and Eravi were disrupting the office. Strole's claim of disruption was not based on his own observation of any disruptive conduct but was made at Ganieany's instruction, contradicting Strole's own contemporaneous assessment communicated through the glass seconds earlier.

11

**46.** Strole said as a KHP supervisor he was asking Spiehs and Eravi to leave because he now claimed they both were disrupting the office. When they explained to Strole that his instructions were unconstitutional, Strole turned back toward Ganieany.

**47.** Eravi observed hand signals between Ganieany and defendant Hummel indicating Ganieany to direct the arrest of Eravi and Spiehs. Dr. Spiehs attempted to explain that he was there for a scheduled records inspection, that he was engaged in lawful speech, and that he had done nothing unlawful or physically disruptive.

**48.** Eravi pointed out that Ganieany could be seen through the window instructing Strole what to say. Hummel then looked through the window toward Ganieany.

**49.** Dr. Spiehs observed Hummel looking through the lobby office reception window toward Ganieany where Spiehs saw Ganieany give a "thumbs up" gesture to Hummel, who then returned a "thumbs-up" gesture. Hummel then immediately turned to arrest Eravi, after which Chavez motioned to Baeza to arrest Dr. Spiehs.

**50.** Defendant Hummel, upon being directed by Ganieany's thumbs-up gesture, immediately turned and arrested Eravi. Hummel was not present for the majority of the events in the public lobby and had no independent basis to conclude that any crime had been committed.

**51.** After being handcuffed and taken outside, Eravi was searched and told by Hummel that Eravi's crime was trespassing. Baeza told Spiehs in his patrol car that Spiehs was arrested for trespassing. At the jail, when asked about the interference charge, Defendant Hummel stated: "That's what I was told to write. I wasn't there

12

the whole entire time." Hummel thus admitted that the criminal charge he filed was dictated to him by others and was not the product of his own observation of criminal conduct.

52. During booking, Hummel described the charge against Eravi variously as "trespassing," then "interference," then "interference with a workspace," and then "interference LEO," and was unable to identify any statute corresponding to "interference with a workspace." The charge shifted at least four times within a single booking interaction.

53. Neither Spiehs nor Eravi threatened anyone. Neither touched anyone or blocked ingress or egress to the lobby. Eravi and Spiehs did not damage property, or physically interfere with any law-enforcement function.

54. Both Spiehs' and Eravi's alleged crimes consisted of protected speech, criticism of officials, questioning legal authority, carrying and displaying a written message, recording public interactions with KHP staff and law enforcement.

55. No crimes were committed by either Eravi or Spiehs and there was no probable cause to arrest either Dr. Spiehs or Eravi for any crime. Dr. Spiehs was lawfully and peacefully present in a public government records office for a scheduled records appointment, and the orders to leave was not based on any lawful, viewpoint-neutral, nonretaliatory ground.

56. There was no probable cause to arrest Dr. Spiehs or Eravi for interference with law enforcement because neither obstructed, resisted, opposed, or otherwise physically interfered with any legitimate law-enforcement duty.

57. After the plaintiff and Eravi bonded out, they walked back to the KHP records office. Spiehs asked for the return of his written messaging, asked why he had not been formally trespassed, and again asked to again inspect and view the records.

58. Strole initially said he would get the records set up for viewing and said he had called Ganieany to come back to the office.

59. After Spiehs and Eravi were released and returned to the KHP records office, Defendant Ganieany claimed he had not become angry during the earlier encounter and denied that he had pointed his finger in Eravi's face. Both of these statements were false and were contradicted by video recordings made by Spiehs and Eravi during the encounter.

60. When Dr. Spiehs asked how his open records request now differed from what had happened earlier, Strole told him to talk to Ganieany about it. Ganieany soon returned to the records office. During this second records request encounter, Ganieany said he had gotten "a little excited" when Dr. Spiehs referred to asshole.

61. After Spiehs and Eravi were released and returned to the KHP records office, Ganieany again denied Spiehs access to the records and stated that things were going to go "how it did earlier today," referring to the arrest, if Spiehs persisted. Ganieany then exited through the back of the restricted area. Strole then informed Spiehs that

Ganieany had instructed him that Spiehs could no longer inspect the records that day without a new appointment.

**62.** Ganieany told Dr. Spiehs that he would not be permitted to record his inspection and viewing of the video and said if things continued, they would go "how it did earlier today."

**63.** Dr. Spiehs told Ganieany he wanted to inspect the records to which Ganieany said Spiehs needed to leave or KHP was "going to spin this up the way it went this morning."

**64.** Ganieany left the lobby through the lobby restricted area door. Strole then told Dr. Spiehs that Ganieany had instructed Strole to prohibit Dr. Spiehs from inspecting the records and that Dr. Spiehs would have to request a different day to inspect the records.

**65.** At the jail, Nurse Hallie Hay told Eravi that if he declined to answer medical intake questions he would be stripped naked and placed on suicide watch, a procedure previously used against Plaintiff Spiehs during a prior detention. Eravi, who had exhibited no signs of mental distress, asked Defendant Hummel whether he had observed any indication that Eravi posed a risk to himself or others. Hummel answered no. Hay's threat to impose suicide watch as a consequence of exercising the right to remain silent constituted compelled speech under threat of punitive physical conditions of confinement.

## COUNT I
## 42 U.S.C. § 1983
## Fourth Amendment – Unreasonable Seizure / Excessive Force
## Against Individual Defendants

66. Plaintiff incorporates by reference paragraphs.

67. The arrest of Dr. Spiehs was without probable cause from its inception. Because the seizure of Dr. Spiehs' person was unlawful at the moment it began, any and all force used to execute that arrest was objectively unreasonable under the Fourth Amendment. An officer cannot render reasonable the physical act of seizing a person whose seizure had no lawful basis. The handcuffing and physical restraint of Dr. Spiehs, however routine in manner, constituted excessive force because the arrest that force was used to accomplish was itself unconstitutional. There is no constitutional application of force in the service of an unconstitutional arrest.

68. Prior to Ganieany's arrival in the lobby, Chavez told Eravi and Spiehs that they were "just standing there" and that no disruption had occurred..

69. After the arrest, Defendant Chavez told Eravi that Eravi had been arrested "because you're with him," confirming that no individualized probable cause existed as to Eravi and that his arrest was based entirely on his association with Plaintiff Spiehs.

70. Chavez further told Eravi that Eravi was considered part of the alleged disturbance because he had been "reading the statutes" aloud during the legal discussion. Reading a statute to a law enforcement officer is protected speech. No other conduct by Eravi was identified by any defendant as a basis for his arrest.

16

71. Chavez further stated that it was up to office personnel to decide what constituted a disruption and that the troopers were acting on the office supervisor's characterization rather than on their own observation of any criminal conduct.

72. Defendant Baeza, one of the arresting officers, had been employed as a law enforcement officer for approximately six months at the time of the arrest and was in field training under Defendant Chavez on the date of the incident.

73. Chavez also acknowledged that, immediately before the effort to remove and arrest Plaintiff began, Plaintiff was still being allowed to view the video so long as he did not record it, and that when that condition was challenged as unlawful the effort to expel and arrest Plaintiff began.

74. Chavez later stated that it was up to office personnel to decide what was "disruptive" and that the asserted disturbance came from what the office supervisor said, showing that the troopers were not acting on any independent observation of criminal conduct but were enforcing the office's speech-based demand that Plaintiff leave.

75. At the jail, Hummel admitted that the "interference" charge was "what I was told to write" and further admitted that he "wasn't there the whole entire time," confirming that the later interference charge was not the product of an independent on-scene determination of probable cause.

76. During booking, Hummel did not describe a single stable charge. He first said the added charge was "interference," then described it as "interference with a

workspace," and then as "interference LEO," illustrating the shifting and pretextual nature of the asserted basis for arrest.

77. Dr. Spiehs intends to continue making KORA requests to inspect and copy KHP records.

78. Dr. Spiehs also intends to continue engaging in citizen journalism as well as peaceful, protected speech critical of KHP officers and officials, including verbal criticism, questioning asserted legal authority, displaying written messages, and recording public interactions in public spaces.

66. Because KHP officials have previously unconstitutionally used force and arrested Dr. Spiehs for his protected speech, and due to the fact there is an ongoing dispute with him regarding KORA records access prior to March 13, 2026, then arresting him during the March 13 inspection, then threatened to "spin this up" again when he returned after release, Dr. Spiehs faces a real and ongoing threat of future enforcement based on protected speech.

79. That intentional application of force constituted a seizure within the meaning of the Fourth Amendment. The force used was objectively unreasonable under the circumstances.

80. Defendant Ganieany was not part of KHP's ordinary arrest-command structure and had no routine field-supervisory authority over troopers to direct arrests. Even so, acting under color of state law as KHP's General Counsel, he inserted himself into that role and personally set in motion the sequence that culminated in Plaintiff's

arrest. Ganieany ordered that Plaintiff be removed, announced arrest for "interference," directed troopers to issue the leave order, and caused those troopers to carry out his decision.

81. Defendants Ganieany and Strole initiated, procured, directed, or set in motion Plaintiff's arrest by improperly conditioning his open records and request, silencing the plaintiff, then demanding that Dr. Spiehs be removed from the public lobby and by manufacturing a pretext for arrest.

82. Defendants Chavez, Hummel, and Baeza directly participated in carrying out the arrest.

83. At the time of the arrest, Dr. Spiehs had committed no crime in the presence of any defendant.

84. There was no probable cause, or even arguable probable cause, to arrest Plaintiff for criminal trespass because Plaintiff was present in a public government office for a scheduled records appointment and had not been lawfully excluded on a valid, viewpoint-neutral basis.

85. There was no probable cause, or even arguable probable cause, to arrest Plaintiff for interference with law enforcement because Plaintiff did not obstruct, resist, oppose, or physically interfere with any legitimate law-enforcement duty.

86. No reasonable KHP employee could believe it was lawful to arrest the plaintiff under these circumstances.

19

87. Plaintiff's arrest and seizure were therefore unreasonable under the Fourth Amendment.

88. As a direct and proximate result, Plaintiff suffered loss of liberty, humiliation, emotional distress, and other compensable damages. As a direct and proximate result of each of the defendants' unconstitutional conduct, Plaintiff suffered the injuries and damages described above.

84. Plaintiff seeks compensatory damages, nominal damages, punitive damages against the individual-capacity defendants, costs, and attorney's fees.

**COUNT II**
**42 U.S.C. § 1983**
**First Amendment Retaliation and Viewpoint Discrimination**
**Against Individual Defendants**

89. Plaintiff incorporates by reference paragraphs.

90. Plaintiff engaged in protected First Amendment activity by recording the defendants speech and conduct in the KHP public lobby.

91. Plaintiff engaged in protected First Amendment activity by speaking to the defendants regarding the right to record what a KORA records inspection can view and inspect.

92. Plaintiff engaged in protected First Amendment activity by speaking to the defendant Ganieany while he was reading a KORA statute on his telephone.

93. Plaintiff engaged in activity protected by the First Amendment, including criticizing government officials, verbally disputing their asserted legal authority, using profanity, displaying a written message critical of defendant Chavez, recording

public interactions, and refusing to stop speaking merely because a government lawyer Ganieany demanded silence.

94. Defendants Ganieany, Strole, Chavez, Hummel, and Baeza subjected Plaintiff to adverse action by ordering him out of a public government lobby, threatening him with arrest, causing or participating in his arrest, and again threatening renewed arrest when he returned after release.

95. Plaintiff's recording of activity, speech, and viewpoint were substantial and motivating factors in Defendants' actions.

96. Defendants' speech and conduct were not neutral responses to any true disruption. The alleged reasons for arrest were pretextual and were invoked because Defendants objected to Plaintiff's recording, protected speech, criticism, use of the word "asshole," and persistence in the dialogue.

97. By these actions, Defendants violated Plaintiff's rights under the First Amendment.

98. As a direct and proximate result, Plaintiff suffered arrest, seizure, humiliation, emotional distress, loss of liberty, and ongoing chill of protected speech.

75. Plaintiff seeks compensatory damages, nominal damages, punitive damages against the individual-capacity defendants, costs, attorney's fees.

99. As a direct and proximate result of defendants' retaliation, Plaintiff suffered the injuries and damages described above.

21

## COUNT III
## 42 U.S.C. § 1983
## Civil Conspiracy
## Against Individual Defendants

100. Plaintiff incorporates by reference all preceding paragraphs.

101. A civil conspiracy under 42 U.S.C. § 1983 exists where two or more persons acting under color of state law reach an agreement, explicit or implicit, to deprive a plaintiff of a constitutional right, and an overt act is committed in furtherance of that agreement causing injury.

102. Defendant Ganieany is KHP's General Counsel and occupies no position in KHP's ordinary law enforcement command structure. He has no routine field authority to direct sworn troopers to arrest members of the public. Nevertheless, on March 13, 2026, Ganieany inserted himself into that role and personally orchestrated the decision to arrest Plaintiff and Eravi.

103. Beginning at the moment Ganieany entered the public lobby, Defendants Ganieany, Chavez, Hummel, Baeza, and Strole acted in concert pursuant to a shared plan to remove Plaintiff from the KHP records office and arrest him in retaliation for his protected speech, his refusal to stop speaking, and his insistence on his statutory right to copy the records he had come to inspect.

104. The existence of that agreement is established by the following overt acts and admissions:

22

105. Ganieany personally directed Trooper Chavez to order Plaintiff and Eravi to leave, saying "Would you mind ordering them to leave?" This was not a request made through any chain of command — it was a civilian directing sworn officers to act on his behalf.

106. Ganieany announced, before any trooper had made an independent determination, that Plaintiff would be arrested for "interference" if he did not leave, and specified the charge to be used.

107. Defendant Chavez exited the lobby into the restricted area and spoke by phone with Ganieany with his body camera muted, concealing the substance of their coordination from any recording.

108. Defendant Strole, at Ganieany's visible direction, reversed his own contemporaneous assessment — communicated seconds earlier by shaking his head when Ganieany asked whether he had any issue with Plaintiff's presence — and came to the lobby door to manufacture a disruption justification he had just denied existed.

109. Ganieany, standing behind Strole and Chavez in the restricted area, made eye contact with Defendant Hummel through the reception window. Ganieany gave Hummel a thumbs-up gesture. Hummel returned the gesture and immediately turned to arrest Eravi. Chavez simultaneously motioned to Baeza to arrest Plaintiff. No defendant made any independent assessment of probable cause in the moments before the arrests.

110. Defendant Hummel subsequently admitted that the interference charge he filed was "what I was told to write" and that he "wasn't there the whole entire time," confirming that the charge was the product of the conspiracy rather than Hummel's own observation of criminal conduct.

111. The charge itself shifted at least four times during booking — trespassing, interference, interference with a workspace, interference with a law enforcement officer — because no defendant could identify an actual crime that had been committed. The shifting and inconsistent charges reflect the absence of any pre-existing lawful basis for arrest and confirm that the charge was constructed after the fact to justify a decision already made.

112. Each Defendant performed one or more overt acts in furtherance of the conspiracy: Ganieany directed the arrests and announced the charge; Strole manufactured the disruption pretext on Ganieany's instruction; Chavez coordinated with Ganieany off-camera, relayed the leave order, and directed Baeza; Hummel executed the arrest of Eravi on Ganieany's signal and filed the dictated charge; Baeza executed the arrest of Plaintiff on Chavez's signal.

113. Each Defendant acted under color of state law. Ganieany acted in his capacity as a KHP employee and general counsel exercising authority over KHP operations. Each trooper acted in his capacity as a sworn KHP officer.

114. As a direct and proximate result of this conspiracy, Plaintiff was arrested without probable cause, held in custody, and suffered loss of liberty, humiliation, emotional distress, and ongoing chill of protected speech and civic activity.

115. Plaintiff seeks compensatory damages, nominal damages, punitive damages against each individual-capacity Defendant, costs, and attorney's fees pursuant to 42 U.S.C. § 1988.

**COUNT IV**
**42 U.S.C. § 1983 — Prospective Declaratory and Injunctive Relief**
**Against Defendant Erik Smith in His Official Capacity**

116. Plaintiff incorporates by reference all preceding paragraphs.

117. Defendant Erik Smith is the Superintendent of the Kansas Highway Patrol and is sued in his official capacity only for prospective declaratory and injunctive relief.

118. This Count seeks no damages against Defendant Smith. It seeks only forward-looking relief to prevent future violations of Plaintiff's rights under the First and Fourth Amendments. Prospective official-capacity relief of this kind is authorized under *Ex parte Young,* 209 U.S. 123 (1908). State agencies themselves are not proper § 1983 damages defendants. *Will v. Mich. Dep't of State Police,* 491 U.S. 58 (1989).

119. Plaintiff intends to reschedule the same records request that was the subject of the March 13, 2026 encounter, consistent with KHP's statement that he would need to request a different day to inspect the records.

120. Plaintiff regularly makes Kansas Open Records Act requests as part of his citizen-journalism activities and intends to continue making such requests, including future requests directed to KHP.

121. Plaintiff also intends to continue engaging in protected First Amendment activity during future records inspections and related encounters with KHP personnel, including questioning asserted legal authority, criticizing government officials, using protected profanity, displaying written messages, recording public interactions in public spaces, and stating his legal position that he may lawfully memorialize and later publish what KHP permits him to view.

122. Plaintiff faces a real, immediate, and ongoing threat of future unconstitutional enforcement by KHP personnel. Before the March 13, 2026 arrest, KHP personnel asserted that if Plaintiff recorded what he was permitted to view, he would be ordered to leave and "the same thing that always happens" would occur. Plaintiff was then arrested during the records-inspection encounter. After Plaintiff was released and returned to the records office the same day, KHP personnel again threatened that matters would go "how it did earlier today" and that KHP would "spin this up the way it went this morning" if Plaintiff persisted.

123. Those threats, combined with the March 13, 2026 arrest itself, demonstrate a continuing KHP policy, practice, or threatened practice of ordering Plaintiff to leave, threatening Plaintiff with arrest, or arresting Plaintiff during records inspections based on protected speech, protected criticism of government officials, legal

disagreement over asserted inspection conditions, or Plaintiff's stated intention to document and later publish what KHP permits him to view.

124. That threat is concrete and imminent because Plaintiff intends to return to the same KHP office to pursue the same records request, under the same asserted inspection condition, and the same officials or their successors will administer and enforce that condition unless enjoined. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

125. Kansas law does not expressly provide that a person who is lawfully permitted to view a body-camera recording must do nothing more than passively watch it. K.S.A. 45-219(a) states that a person with access to a public record may make abstracts or obtain copies of that record. K.S.A. 45-219(i) shows that when the Legislature wished to prohibit a specific method of capture, it did so expressly by providing that KORA does not require an agency to allow a requester to attach the requester's own device to the agency's device. K.S.A. 45-254, which grants qualifying persons the right to listen to or view body-camera recordings, does not say "view only," does not forbid note-taking, abstracting, dictation, recitation, or other requester-created memorialization, and expressly states that its disclosure right exists in addition to disclosure authorized by KORA. K.S.A. 45-216(a) further declares as public policy that public records shall be open for inspection and directs that KORA "shall be liberally construed and applied" to promote that openness.

126. To the extent the word "view" in K.S.A. 45-254 is ambiguous, that ambiguity cannot be expanded into a passive-observation-only rule that silently forbids notes,

27

abstracts, descriptions, recitations, or other memorialization. Such a reading would conflict with K.S.A. 45-219(a)'s express authorization to make abstracts and with K.S.A. 45-216(a)'s liberal-construction command. It would also read into the statute restrictions the Legislature did not write. Under KHP's reading, moreover, a blind requester could never meaningfully exercise the statutory right at all, because any accommodation—transcription, audio description, note-taking by an assistant, or comparable aid—would constitute something "more than viewing." That absurd consequence confirms that the Legislature intended no such restriction.

127. Plaintiff does not seek, in this Count, a declaration that KHP must furnish him a copy of any body-camera recording. Plaintiff also does not seek an order requiring KHP to permit him to connect any device to KHP equipment. Plaintiff seeks only protection from leave orders, arrest threats, or arrests imposed because he states his legal position, criticizes KHP's contrary interpretation, or says he intends to memorialize and later publish truthful information that KHP lawfully permits him to observe.

128. Once KHP permits Plaintiff to view a recording, Plaintiff has lawfully obtained the information it contains. The First Amendment protects not only core expression but also the creation and dissemination of information as speech. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570–71 (2011). The government may not burden a speaker's right to use, describe, or publish truthful information lawfully in the speaker's possession merely because the government dislikes the speaker's intended use of that information. *Bartnicki v. Vopper*, 532 U.S. 514, 527–28 (2001). The Supreme Court

28

has held that publication is protected even where the original acquisition of the information by a third party was itself unlawful. *Bartnicki* at 528–35. A fortiori, the government may not punish a citizen for speaking about, describing, or publishing truthful information that the citizen himself lawfully obtained through a government-authorized inspection.

**129.** The Tenth Circuit has recognized a clearly established First Amendment right to record police performing their duties in public. *Irizarry v. Yehia,* 38 F.4th 1282, 1288 (10th Cir. 2022). KHP's threatened enforcement policy burdens that same protected activity and its necessary predicates: Plaintiff's criticism of police conduct, his legal disagreement over KHP's asserted inspection conditions, his newsgathering, his documentation of official conduct, and his intended later publication of truthful information about police activity.

**130.** KHP's threatened enforcement policy also constitutes viewpoint-based retaliation. On the facts alleged, the threat of a leave order or arrest is triggered not by physical obstruction, violence, or genuine disruption, but by Plaintiff's criticism of KHP officials, Plaintiff's insistence on a contrary legal interpretation, Plaintiff's refusal to stop speaking, and Plaintiff's stated intention to document and publish what he lawfully observes. Discrimination against speech because of its viewpoint is presumed unconstitutional and constitutes an egregious form of content discrimination that the First Amendment does not tolerate. *Matal v. Tam*, 582 U.S. 218, 243 (2017); *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829 (1995). Because this Count seeks only prospective injunctive and declaratory relief,

29

it challenges a threatened, ongoing, viewpoint-based enforcement policy rather than a backward-looking damages claim for a discrete arrest.

131. KHP's threatened enforcement policy further operates as an unconstitutional condition. As alleged, KHP will permit Plaintiff to inspect recordings only if Plaintiff refrains from asserting his legal position, refrains from stating his intention to memorialize what he sees, and refrains from later publishing truthful information that he lawfully obtains. The government may not deny a benefit or continued access to a statutory forum for a reason that infringes constitutionally protected freedoms. *Perry v. Sindermann,* 408 U.S. 593, 597 (1972). The government may not, in particular, condition access to a statutory benefit on the surrender of First Amendment rights. *Agency for Int'l Dev. v. Alliance for Open Society Int'l, Inc.*, 570 U.S. 205, 214 (2013).

132. Plaintiff's threatened future injury is not conjectural or hypothetical. The threatened injury here arises from Plaintiff's stated intent to reschedule the original records request, his regular practice of making KORA requests as a citizen journalist, the same ongoing dispute over KHP's asserted no-recording condition, the same KHP office in which the March 13, 2026 arrest occurred, and the same officials or their successors who are expected to enforce the same rule when Plaintiff returns.

133. Absent declaratory and injunctive relief, Plaintiff reasonably fears that KHP personnel will again order him to leave, threaten him with arrest, or arrest him during future records inspections because of his protected speech, criticism, legal

30

disagreement, or stated intention to document and later publish what KHP lawfully permits him to view.

**134.** The threatened future enforcement described above would violate Plaintiff's rights under the First Amendment because it would retaliate against protected speech, protected criticism, protected newsgathering, protected recording-related activity, and the dissemination of truthful information on a matter of public concern. *Sorrell* at 570–71; *Bartnicki* at 527–28.

**135.** To the extent any future enforcement action is based solely on Plaintiff's protected expression and therefore lacks probable cause independent of and untainted by viewpoint discrimination, such enforcement would also violate Plaintiff's rights under the Fourth Amendment.

**136.** Plaintiff has no adequate remedy at law to prevent these threatened future violations. Damages for past misconduct will not protect Plaintiff from being again silenced, excluded, threatened, or arrested during future records inspections. The loss of First Amendment freedoms, even for minimal periods of time, constitutes irreparable injury. *Elrod v. Burns,* 427 U.S. 347, 373 (1976). Each inspection at which Plaintiff is chilled, silenced, expelled, or arrested is a discrete and irreparable loss of First Amendment liberty.

**137.** Plaintiff is therefore entitled to a declaration that the threatened future use of leave orders, arrest threats, or arrests against him during records inspections based on protected speech, criticism, legal disagreement over asserted inspection

conditions, or Plaintiff's stated intention to memorialize and later publish what KHP lawfully permits him to view would violate the First Amendment, and, where probable cause is absent independent of protected expression, the Fourth Amendment as well.

138. Plaintiff is also entitled to prospective injunctive relief prohibiting Defendant Erik Smith, in his official capacity, and those acting in concert with him, from ordering Plaintiff to leave, threatening Plaintiff with arrest, or arresting Plaintiff during future records inspections based on Plaintiff's protected speech, criticism of government officials, legal disagreement over asserted inspection conditions, or Plaintiff's stated intention to document and later publish truthful information that KHP lawfully permits him to view, absent lawful, viewpoint-neutral, and constitutionally sufficient grounds independent of protected expression.

139. Plaintiff does not ask this Court, in this Count, to compel KHP to furnish him copies of recordings, to resolve every hypothetical method of requester-created memorialization, or to supervise KHP's records operations generally. Plaintiff seeks only to prevent KHP from using arrest power to suppress protected speech, legal disagreement, criticism, and intended publication of lawfully obtained information during future records inspections.

140. Plaintiff requests that the Court enter judgment in his favor on this Count and

A. Declare that the threatened future use of leave orders, arrest threats, or arrests against Plaintiff during records inspections based on Plaintiff's protected speech, criticism, legal disagreement, or stated intention to document and later publish

32

truthful information that KHP lawfully permits him to view would violate the First Amendment, and where probable cause is absent independent of protected expression, the Fourth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

A. Compensatory damages including nominal damages in an amount to be determined at trial against each individual Defendant;

B. Punitive damages against each Individual Defendant;

C. Reasonable attorney's fees and costs under 42 U.S.C. § 1988;

D. Prejudgment and post judgment interest as allowed by law;

E. Declaratory and Injunctive relief against Smith in his official capacity; and

F. Such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

By:/s/Linus L. Baker
Linus L. Baker KS 18197
6732 West 185th Terrace
Stilwell, Kansas 66085-8922
913.486.3913
913.232.8734 (fax)
E-Mail: linusbaker@prodigy.net
Attorney for the plaintiff